UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff,*

    *vs.*                                        Case No. 23-cr-10-JPS-SCD

JOSEPH THOMAS,

    *Defendant.*

## MOTION TO SUPPRESS STATEMENT

On November 11, 2021, Joseph Thomas, then under state supervision, was ordered by his supervision agent, Jonathan Gotz, to report to the Community Corrections office in Kenosha, Wisconsin. After Thomas showed up as required, he was promptly confronted by two federal agents, Kastner and Kowalski, who brought him to an interrogation room for questioning related to a child pornography investigation.

The agents told Thomas he wasn't under arrest (yet—he was arrested when the interrogation ended), but that they needed to get information from him for their investigation. After collecting so-called background information, Kastner read Thomas his *Miranda* rights. When asked if he was willing to speak, Thomas responded:[1]

> THOMAS: Uh. Well, the last time I talked to law enforcement , it didn't turn out so great for me. So I'm, you--you I understand, I'm kind of hesitant

---

[1] Accompanying this motion is Exhibit A, a flash drive containing an excerpt from the recorded interview provided by the government in discovery. This drive will be hand-delivered to the Court's chambers.

<div style="text-align: right;">*Federal Defender Services*<br>*Of Wisconsin, Inc.*</div>

without any counsel or anything, and um...I just--I'm trying to find out what the world is going on here? This is like—

KASTNER: I know, you probably have a lot of questions. ["I was like, online act--"] Uh, I'd like to answer the questions that I can.

THOMAS: It's like, 'online activity,' I'm like, I...I like visit YouTube and some forums, I mean, I--

KASTNER: Okay. And if it's that simple then it's that simple, but...I can't talk to you unless you say it's okay. Alright? So it's up to you.

KOWALSKI: Here's the deal, too, you can stop at any time. If you want to just start the conversation, you decide you don't like where it's going and you're uncomfortable down the road? Um--

THOMAS: Yeah, I, this is...yeah, this is, uh, this is--I mean you--you s--you're FBI, right?

KASTNER: Right.

THOMAS: Okay, yeah, this is a little bit more than I was...wow, that's...I, yeah, this is, okay this is--I'm sorry, I'm ["I know."]--this is kind of blowing my mind. I don't even...[inaudible]

Exhibit A at 9:45-10:59.

The exchange continues:

KASTNER: So, are you willing to talk to us?

THOMAS: You know, I...I, I would, but...this is...this--this is just way, way, way...this is something I don't think I--I--I'm even qualified to even deal with at the moment. Or even, I--I have no idea how they even go about any of this stuff, **I really need to get some advice**...

KOWALSKI: Sure, and I--I don't, I don't blame you for any of that--["'Cause I--"]--I definitely understand that, but here's the deal: you--you don't even know why we're here, unless you do know why we're here, and then I understand what your feelings are, but...I don't know why we're here, we just can't share our side of the information until we get through that, and you're willing to talk. Keeping in mind that, I mean, it says right [inaudible] in there, at any point if you choose to stop...

THOMAS: I understand, I understand this, it just...I'm, this is one of these situations--okay. Like, I have, you know, the, the, the autism stuff. ["Sure."] I've got all that, and...previous experiences taught me that just going ahead and talking without any--

KASTNER: And that's all we're, that's all we're doing today is having a conversation--

THOMAS: --That's, uh. **Really--I--before I can really go forward, I gotta get some advice from somebody**. You know, my parents, something, because this is, this is well outside of anything that I have...yeah, I...I have no idea what's going on here and...I don't want to be like...because I know one thing is--my autism does tend to make problems for me when I'm trying to talk and...

KASTNER: Sure--

THOMAS: I just--

KASTNER: Well, and we're not gonna put words in your mouth. We're not here to confuse you, or trick you. We're not even here to judge you. We're just here to talk to you and have a conversation.

KOWALSKI: It's also worth saying that your...this investigation has led us to your internet account. It hasn't necessarily led us to you. And so there could be--so there could be something more that you could give us that we're not even talking to the right person right now, but there's no way for us to get to that point until we start having a conversation, we can't have a conversation until you say that you're willing to have a conversation.

THOMAS: My internet account, uh, my IP address, you mean?

KOWALSKI: Yeah.

THOMAS: Oh, oh, now I know what's going on here. I got a good idea what's going on and...

KASTNER: Okay. Well, I hope that makes things a little clearer then.

THOMAS: Yes, it...it does. And...but, mhm...

KASTNER: It sounds like you have a little bit of clarity--

THOMAS: Oh, yeah I--I--I--yeah, I...I uh...oh, I can say this. I...uh, I want to put this on the right way. I, uh, it looks like I'm going to have to cancel everybody I've been sharing my internet service with, and just kick 'em off, because there's some people I can't trust anymore.

KASTNER: And if that's the case, that's the type of discussion we would like to have with you.

THOMAS: Okay, that--that--that's fine, but this is something that, you know, this kind of thing, I mean, the FBI coming and everything...**this feels a lot more serious than just, uh, you know, something that I feel comfortable navigating by myself.**

KOWALSKI: I, that's, sure--

THOMAS: You can un--you can understand.

KOWALSKI: Oh, I can absolutely understand that--

THOMAS: Because, I mean, you got, I mean, look at that, it's a two-to-one situation. You know, you got actual FBI agents, you just got me, some schmuck.

KOWALSKI: Well, that's not--

THOMAS: I mean, I...yeah, **uh...I--I--I'd really, really like to be able to, you know, just get some counsel before we go for any kinda investigation, interrogation, whatever.** I mean, it's...is this is, this sounds like it's, it's a bit more than...'cause I did get a nasty gram from Disney, I don't think this is about that, though.

*Id*. at 11:46 – 15:41.

The agents continue to press Thomas to speak, but Thomas is steadfast:

THOMAS: I--I understand you--what you're saying, I do. But...from my, from my previous experience with law enforcement and this kind of thing, um...yeah, I was...well...

KASTNER: Joe, we don't want to see you take the blame for what somebody else did.

THOMAS: Yeah, I...I know that, it just--this is one of these things that I've gotten really badly burned by the legal system before, I mean I'm on probation, but--

4

*Federal Defender Services*
*Of Wisconsin, Inc.*

KASTNER: I understand, but well, I there's a difference because from my conversation with John, you took responsibility for what happened the first time, it was your first mistake, right? ["Mhm."] You admitted to what you did and you've paid the price, right? You got sentenced and you were incarcerated ["Mhm."] and that's different because you did that. If you're telling us that you didn't do this, that's very different. Right?

THOMAS: Okay, I--this is--**I'm way out of my depth here, I really just need to get some help with this whole thing, navigating this, because I don't feel confident.** I mean, you and...if you're just, you know, as you say, just doing your job and whatever, I feel like a major disadvantage right now, myself. **And I would really, really like to be able to get somebody to help me out, on my side, just so we can, you know, cross the T's and dot the I's and go through the proper things, and...I don't know how to navigate this stuff and I don't wanna get myself tangled up in anything—**

*Id*. at 19:37 – 21:50. Even after such an obvious invocation, the agents continue to press him.

Later in the same conversation, Thomas repeats himself:

THOMAS: I'm not comfortable with this entire situation--I don't...I am...I don't know what's going on here. I--I am getting...yeah, I--I--I...I feel like I just got my target on me and I don't know what could've brought this up. ["Well--"] so I am, I—

KASTNER: [inaudible] explain to you why we're talking to you. So, and it sounds like it could be a misunderstanding. It sounds like someone else in the building might be using your IP, you're sharing WIFI from what you've already said. ["Mhm."] We would need some more information about that.

THOMAS: Yeah.

KASTNER: And you're the one who has those answers, that's why we want--we want to talk to you.

THOMAS: Okay, that--that's--I have no objection to talking, but like I said

KASTNER: That's all we're doing, is we're talking.

5

*Federal Defender Services*
*Of Wisconsin, Inc.*

> THOMAS: [pause] I don't... [pause] I mean, I--
>
> KASTNER: As we explained to you--
>
> THOMAS: I--I want to help--
>
> KASTNER: Perfect. Go ahead--
>
> THOMAS: --this, just this, this is just my position. From personal experience and from advice I've gotten, you know, just kind of those PSAs you see, uh, you know, they put out about how to deal with law enforcement kind of stuff is, this kind of situation...I don't want to, you know, give--put myself into a situation where I screw up. Okay, I'm not a professional, like any kind of law stuff at all. And, I mean, being as an FBI investigation was a lot more than just some, you know, city police or something. That sounds to be a lot more serious than whatever else I could possibly think. **And so I...really, I--I--I need legal representation**. I mean, I just, I don't wanna risk...you know...

*Id.* at 22:15 – 25:02.

Instead of ending the interview upon Thomas' invocation, the agents continue pressuring him. But Thomas continues to resist:

> THOMAS: [pause] The thing is...I'm hearing what you're saying, you know, all that um, but uh...[pause] I'm...[pause] No, I--I--I want to be able to tell everything that I know what's going on with my computer's internet, whatever. **But at the moment, every piece of advice I have ever gotten for dealing with law enforcement and investigators and everything is screaming at me that just going ahead and...and talking without any counsel at all is not going to do me any good at all for...[pause] And I've been told it's a very, very, uh, poor choice to speak with investigators without getting any kind of legal counsel.** ['Mhm."] Um, because...[pause] I mean, it says it right here. Anything you say can be used against you.
>
> KOWALSKI: Absolutely.
>
> THOMAS: Okay.
>
> KOWALSKI: You understand your rights.

6

*Federal Defender Services*
*Of Wisconsin, Inc.*

> THOMAS: The thing is that it's anything ["Mhm."] I say ["Mhm."] regardless of any context, or regardless of any kind of...
>
> KASTNER: Well, we put it into context.
>
> KOWALSKI: You put it into context.
>
> THOMAS: What I'm saying is, I don't...I don't have much faith in the legal system in general--in general to show any kind of, uh, well...
>
> KOWALSKI: You don't have to sugarcoat it. You're not hurting our feelings.
>
> KASTNER: Okay. Alright. And I--I--I'm trying to--trying to--I don't want to aggravate you. I know, I want, I'm trying to--I want to fill this out. I really do.
>
> KOWALSKI: Joe. Unless you want--unless you start fighting with us, you're not gonna aggravate me, at the end of the day--
>
> THOMAS: Okay, okay, I'm just, I'm trying--
>
> KOWALSKI: --and I mean that wholeheartedly.
>
> THOMAS: Look, I'm just trying to be uh, you know, like, I s--I've got the autism, I have trouble ["I get it."] dealing with people, very much so, and so...in this situation, this is one of these kind of things that...you know, **I could really use like a--a--a counselor, or therapist, or something to just guide me,** because...uh I--I don't even...[pause]
>
> KASTNER: We're not try--we're not trying to trick you.
>
> THOMAS: My apologies, but that's your entire job, is to say things and use whatever means to try to make your case. Not actually, you know, find out what really happened, okay? I--I--

*Id.* at 52:30 – 57:25.

Ultimately, Thomas declined to sign the *Miranda* waiver form or waive his rights, yet agents continued to press him to speak. Eventually, after more than an hour of targeted pressure and coercion, Thomas gave a statement and disclosed various

7

*Federal Defender Services
Of Wisconsin, Inc.*

Case 2:23-cr-00010-JPS   Filed 03/22/23   Page 7 of 12   Document 13

information. Because this statement was acquired in violation of *Miranda*, it must be suppressed. Thomas respectfully moves the Court to do so here.

**Authority**

In *Miranda v. Arizona*, the Supreme Court held that before initiating custodial interrogation, police must advise a suspect of her right to consult with an attorney and to have counsel present during the interrogation. 384 U.S. 436, 469-73 (1966). If a suspect invokes his right to counsel under *Miranda*, he is not subject to further interrogation by the police until counsel is present or unless the suspect himself initiates further discussions. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Arizona v. Roberson*, 486 U.S. 675, 682, (1988); *McNeil v. Wisconsin*, 501 U.S. 171, 176-77 (1991); *Minnick v. Mississippi*, 498 U.S. 146, (1990). The Court adopted this procedure in order to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation. *Miranda*, 384 U.S. at 467. The bright line rule that all questioning must cease after an accused requests counsel prevents the police, through badgering or overreaching, whether explicit or subtle, whether deliberate or unintentional, from wearing down the accused and persuading her to incriminate herself notwithstanding her earlier request for counsel. *United States v. Wysinger*, 683 F.3d 784, 802 (7th Cir. 2012).

"Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994) (internal citations

omitted). To invoke his right to counsel, a suspect "need not speak with the discrimination of an Oxford don" in making such a request; instead "he must articulate his request clearly enough so that a reasonable, under the circumstances, would understand that the suspect was requesting an attorney." *Id.* at 457; *United States v. Peters*, 435 F.3d 746, 751 (7th Cir. 2006) ("The test of whether one has invoked the right to counsel is objective"). A request for counsel should be evaluated "as ordinary people would understand" it, and courts are instructed "to give a broad, rather than a narrow, interpretation to a defendant's request for counsel." *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987).

When a custodial statement is taken, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475. As Thomas argues below, that burden cannot be met here because 1) Thomas invoked his right to counsel, and 2) he did not voluntarily and intelligently waive his right to counsel or to remain silent.

**Argument**

**I.    Thomas' repeated requests, individually and especially combined, clearly communicated his desire for counsel**

When Thomas first said that he really needed to "get some advice" before speaking to agents, that was a clear communication of a desire for counsel. As soon as that statement was made, the questioning should have immediately ceased. But instead of

9

ending the questioning, the agents do precisely what *Miranda* prohibits—they keep pressuring Thomas to talk without counsel. This alone violated *Miranda* and requires suppression of any subsequently obtained statements.

One invocation is all that's necessary to end the questioning, but here we have numerous statements from Thomas that he wants a lawyer. Notwithstanding the repeated invocations, the agents simply never relent. This further exacerbates the constitutional violation.

Thomas's numerous statements seeking counsel can be compared to those the Seventh Circuit has found sufficient to invoke one's right to counsel. In *United States v. Hunter*, for example, the defendant asked "can you call my attorney?" and the Seventh Circuit found that to be an unequivocal request for counsel. 708 F.3d 938, 943–44 (7th Cir. 2013). Similarly, in *United States v. Wysinger*, the court found that the statement "can I call [a lawyer] now?" constituted a clear and unambiguous request for counsel under *Miranda*. 683 F.3d 784, 795-96 (7th Cir. 2012). Luikewise, in *United States v. Lee*, the Seventh Circuit held that a defendant's request, "Can I have a lawyer?" after a police officer read him the *Miranda* warnings, was an unequivocal request for an attorney and an invocation of the right to counsel. 413 F.3d 622, 625 (7th Cir. 2005).

Ultimately, Thomas' multiple statements that he needed, wanted or required the assistance of counsel for questioning, were "statement[s] that can reasonably be construed to be an expression of a desire for the assistance of an attorney," during

10

*Federal Defender Services*
*Of Wisconsin, Inc.*

Case 2:23-cr-00010-JPS   Filed 03/22/23   Page 10 of 12   Document 13

questioning, which is legally sufficient to invoke that right and cease further questioning without counsel. *Davis* 512 U.S. at 459. Accordingly, any statements made without counsel must be suppressed.

### I. Thomas did not voluntarily or intelligently waive his *Miranda* rights

When a custodial statement is taken, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475. "[T]he fact that a person was properly warned of his rights does not inevitably lead to the conclusion that his subsequent statements were obtained without violating those rights." *United States v. Nielsen*, 392 F.2d 849, 852–53 (7th Cir. 1968). Instead, as the Supreme Court made clear, the record must show "that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." *Miranda*, 384 U.S. at 475. This cannot be said to have happened here.

It is beyond question that Thomas expressed his desire for counsel before speaking, and his refusal to sign the *Miranda* form is further evidence of his intent not to waive his rights. Yet agents never provided him counsel, nor did they stop the questioning to allow him to obtain one. Instead, the agents relentlessly pressured him to get him to talk. No waiver can be said to have been made freely, voluntarily, or intelligently under such circumstances. The government therefore cannot meet is burden of proving any valid waiver here.

11

*Federal Defender Services*
*Of Wisconsin, Inc.*

## Conclusion

For all of the foregoing reasons, Thomas moves this Court to suppress his custodial statement and any derivative evidence obtained therefrom as fruit of the poisonous tree.

Dated at Milwaukee, Wisconsin, this 22nd day of March, 2023.

                                Respectfully submitted,

                                /s/ *Ronnie V. Murray*
                                Ronnie V. Murray, WI Bar #1089136
                                Federal Defender Services
                                  of Wisconsin, Inc.
                                411 E. Wisconsin Avenue, Suite 2310
                                Milwaukee, WI 53202
                                Tel. (414) 221-9900
                                Email: ronnie_murray@fd.org

                                *Counsel for Defendant*, Joseph Thomas