UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                Plaintiff,

    v.                                                                       Case No. 23-CR-10-JPS-SCD

JOSEPH THOMAS,

                Defendant.

---

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS STATEMENT

---

**I.    BACKGROUND**

On November 16, 2021, Joseph Thomas, while on probation, was required by his supervision agent to report to the Community Corrections office in Kenosha, Wisconsin. Two federal agents, Kastner and Kowalski, greeted Thomas, and brought him into an office room for questioning related to a child pornography investigation. In the office, Thomas was seated closest to the closed—but unlocked—door. Thomas was neither searched nor restrained before entering the office room and while being questioned. Agents Kastner and Kowalski were in normal professional clothing—they were not in uniform.

The agents explicitly told Thomas that he was not under arrest and that they were there to ask him questions related to a child pornography investigation. After collecting general booking information, the agents read Thomas his *Miranda* rights as part of their procedure and articulated again that Thomas was not under arrest. However, the *Miranda* rights were not due to Thomas because he was not under arrest. Kastner then asked whether Thomas understood his rights, Thomas responded in the affirmative. Parts of the conversation where Kastner and Kowalski

informed Thomas that he was not under arrest and implied that he was free to leave are as follows:

> KASTNER: **You're not under arrest.**

Exhibit A at 1:07-1:09. (Exhibit A was personally submitted to Chambers via a flash drive by defense counsel).

> KASTNER: **Part of our procedure is making sure you know your constitutional rights. Have you been read your rights before?**
>
> THOMAS: **Yeah**, I, uh, before yeah but…
>
> KASTNER: **I'm going to go through them with you now, alright. This is a procedural thing like I said you're not under arrest, but since we want to talk to you, we just want to go through it.**

*Id.* at 8:42-9:03.

> KASTNER: **Understanding that you have these rights are you willing to speak with me and answer some questions?**
>
> THOMAS: Uh. Well, the last time I talked to law enforcement, it didn't turn out so great for me. So I'm, you--you I understand, I'm kind of hesitant without any counsel or anything, and um...I just--I'm trying to find out what the world is going on here? This is like— without any counsel or anything, and um...I just--I'm trying to find out what the world is going on here? This is like—
>
> KASTNER: I know, you probably have a lot of questions. ["I was like, online act--"] Uh, I'd like to answer the questions that I can.
>
> THOMAS: It's like, 'online activity,' I'm like, I...I like visit YouTube and some forums, I mean, I--
>
> KASTNER: Okay. And if it's that simple then it's that simple, **but...I can't talk to you unless you say it's okay. Alright? So it's up to you.**
>
> KOWALSKI: Here's the deal, too, you can stop at any time. **If you want to just start the conversation, you decide you don't like where it's going and you're uncomfortable down the road?** Um--
>
> THOMAS: Yeah, I, this is...yeah, this is, uh, this is--I mean you--you-- you're FBI, right?

*Id.* at 9:45-10:50.

The interview continued:

KASTNER: So, are you willing to talk to us?

THOMAS: You know, I...I, I would, but...this is...this--this is just way, way, way...this is something I don't think I--I--I'm even qualified to even deal with at the moment. Or even, I--I have no idea how they even go about any of this stuff, I really need to get some advice...

KOWALSKI: Sure, and I--I don't, I don't blame you for any of that--["'Cause I--"]--I definitely understand that, but here's the deal: you--you don't even know why we're here, unless you do know why we're here, and then I understand what your feelings are, but...I don't know why we're here, we just can't share our side of the information until we get through that, and you're willing to talk. Keeping in mind that, I mean, it says right [inaudible] in there, at any point if you choose to stop...

THOMAS: I understand, I understand this, it just...I'm, this is one of these situations--okay. Like, I have, you know, the, the, the autism stuff. ["Sure."] I've got all that, and...previous experiences taught me that just going ahead and talking without any--

KASTNER: **And that's all we're, that's all we're doing today is having a conversation**--

THOMAS: --That's, uh. Really--I--before I can really go forward, I gotta get some advice from somebody. You know, my parents, something, because this is, this is well outside of anything that I have...yeah, I...I have no idea what's going on here and...I don't want to be like...because I know one thing is--my autism does tend to make problems for me when I'm trying to talk and...

KASTNER: Sure--

THOMAS: I just--

KASTNER: Well, and we're not gonna put words in your mouth. **We're not here to confuse you or trick you. We're not even here to judge you. We're just here to talk to you and have a conversation.**

KOWALSKI: It's also worth saying that your...this investigation has led us to your internet account. It hasn't necessarily led us to you. And so there could be--so there could be something more that you could give us that we're not even talking to the right person right now, but there's no way for us to get to that point until we start having a conversation, we can't have a conversation until you say that you're willing to have a conversation.

THOMAS: My internet account, uh, my IP address, you mean?

KOWALSKI: Yeah.

THOMAS: Oh, oh, now I know what's going on here. I got a good idea what's going on and...

KASTNER: Okay. Well, I hope that makes things a little clearer then.

THOMAS: Yes, it...it does. And...but, mhm...

KASTNER: It sounds like you have a little bit of clarity—

THOMAS: Oh, yeah I--I--I--yeah, I...I uh...oh, I can say this. I...uh, I want to put this on the right way. I, uh, it looks like I'm going to have to cancel everybody I've been sharing my internet service with, and just kick 'em off, because there's some people I can't trust anymore.

KASTNER: And if that's the case, that's the type of discussion we would like to have with you.

THOMAS: Okay, that--that--that's fine, but this is something that, you know, this kind of thing, I mean, the FBI coming and everything...this feels a lot more serious than just, uh, you know, something that I feel comfortable navigating by myself.

KOWALSKI: I, that's, sure—

THOMAS: You can un--you can understand.

KOWALSKI: Oh, I can absolutely understand that—

THOMAS: Because, I mean, you got, I mean, look at that, it's a two-to-one situation. You know, you got actual FBI agents, you just got me, some schmuck.

KOWALSKI: Well, that's not--

THOMAS: I mean, I...yeah, uh...I--I--I'd really, really like to be able to, you know, just get some counsel before we go for any kinda investigation, interrogation, whatever. I mean, it's...is this is, this sounds like it's, it's a bit more than...'cause I did get a nasty gram from Disney, I don't think this is about that, though.

*Id.* at 11:46 – 15:41.

Thomas continued:

> THOMAS: I--I understand you--what you're saying, I do. But...from my, from my previous experience with law enforcement and this kind of thing, um...yeah, I was...well...

KASTNER: Joe, we don't want to see you take the blame for what somebody else did.

THOMAS: Yeah, I...I know that, it just--this is one of these things that I've gotten really badly burned by the legal system before, I mean I'm on probation, but--

KASTNER: I understand, but well, I there's a difference because from my conversation with John, you took responsibility for what happened the first time, it was your first mistake, right? ["Mhm."] You admitted to what you did and you've paid the price, right? You got sentenced and you were incarcerated ["Mhm."] and that's different because you did that. If you're telling us that you didn't do this, that's very different. Right?

THOMAS: Okay, I--this is--I'm way out of my depth here, I really just need to get some help with this whole thing, navigating this, because I don't feel confident. I mean, you and...if you're just, you know, as you say, just doing your job and whatever, I feel like a major disadvantage right now, myself. And I would really, really like to be able to get somebody to help me out, on my side, just so we can, you know, cross the T's and dot the I's and go through the proper things, and...I don't know how to navigate this stuff and I don't wanna get myself tangled up in anything—

*Id*. at 19:37 – 21:50.

> KASTNER: **You mentioned talking to your parents?**
>
> THOMAS: Yeah.
>
> KASTNER: **If I called one of them would you want to talk to your mom or your dad?**
>
> THOMAS: My dad's in the parking lot right now.
>
> KASTNER: **Okay. If I had a conversation with him right now and filled him in with what's going on and he talked to you, would you be comfortable then?**

*Id*. at 21:50 – 22:18.

> KOWALSKI: . . . Today's the day, and now's the time, you step off that road. **Because if you leave here, the story is whatever we find.** The story is not Joe Thomas's story in Joe Thomas's words.

*Id.* at 49:44-50:00.

> KASTNER: **We're going to take a break. Joe, do you need to use the restroom?**
>
> THOMAS: Yeah, I-I-I could use the bathroom.

*Id.* at 2:54:30-2:54:35

Kastner then showed Thomas where the bathroom was. After Kastner and Thomas returned from the restroom, the door to the office remained open.

Thomas also engaged in conversation in which he stated he wanted to "help":

KASTNER: And you're the one who has those answers, that's why we want--we want to talk to you.

THOMAS: Okay, that--that's--**I have no objection to talking**, but like I said. . .

KASTNER: **That's all we're doing, is we're talking.**

THOMAS: [pause] I don't... [pause] I mean, I—

KASTNER: As we explained to you—

THOMAS: I--**I want to help**--

KASTNER: Perfect. Go ahead—

*Id*. at 23:04 – 24:03.

THOMAS: [pause] The thing is...I'm hearing what you're saying, you know, all that um, but uh...[pause] I'm...[pause] No, I--I--**I want to be able to tell everything that I know what's going on with my computer's internet**, whatever. But at the moment, every piece of advice I have ever gotten for dealing with law enforcement and investigators and everything is screaming at me that just going ahead and...and talking without any counsel at all is not going to do me any good at all for...[pause] And I've been told it's a very, very, uh, poor choice to speak with investigators without getting any kind of legal counsel. ['Mhm."] Um, because...[pause] I mean, it says it right here. Anything you say can be used against you.

KOWALSKI: Absolutely.

THOMAS: Okay.

KOWALSKI: You understand your rights.

THOMAS: The thing is that it's anything ["Mhm."] I say ["Mhm."] regardless of any context, or regardless of any kind of...

KASTNER: Well, we put it into context.

KOWALSKI: You put it into context.

THOMAS: What I'm saying is, I don't...I don't have much faith in the legal system in general--in general to show any kind of, uh, well...

KOWALSKI: You don't have to sugarcoat it. You're not hurting our feelings.

KASTNER: Okay. Alright. And I--I--I'm trying to--trying to--I don't want to aggravate you. I know, I want, I'm trying to--I want to fill this out. I really do.

KOWALSKI: Joe. Unless you want--unless you start fighting with us, you're not gonna aggravate me, at the end of the day--

THOMAS: Okay, okay, I'm just, I'm trying--

KOWALSKI: --and I mean that wholeheartedly.

THOMAS: Look, I'm just trying to be uh, you know, like, I s--I've got the autism, I have trouble ["I get it."] dealing with people, very much so, and so...in this situation, this is one of these kind of things that...you know, I could really use like a--a--a counselor, or therapist, or something to just guide me, because...uh I--I don't even...[pause]

KASTNER: We're not try--we're not trying to trick you.

THOMAS: My apologies, but that's your entire job, is to say things and use whatever means to try to make your case. Not actually, you know, find out what really happened, okay? I--I--

*Id*. at 52:30 – 57:25.

Near the end of the interview, Thomas made numerous incriminating statements resulting in his arrest.

**II.    DISCUSSION**

   **A.  The Defendant's Motion to Suppress Statement must be denied.**

The Fifth Amendment requires that law enforcement officers administer *Miranda* warnings when a person is subject to a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A defendant may waive his *Miranda* rights and agree to speak to authorities as long as the waiver is "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and is made knowingly, voluntarily, and intelligently, "with full

awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Outland*, 993 F.3d 1017, 1021 (7th Cir. 2021). "*Miranda* warnings are not required merely because the individual questioned by law enforcement officers is a subject or is the focus of a criminal investigation. The suspect must be both 'in custody' and subject to 'interrogation' before the *Miranda* warning[s] are required to be administered." *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006).

Thomas was not "in custody" when agents Kowalski and Kastner interviewed him. Even if this Court finds that Thomas was in custody while interviewed, Thomas knowingly, voluntarily, and intelligently waived his right to counsel. Therefore, Thomas's statements were not made in violation of *Miranda*.

### 1. Thomas was not "in custody" during the interview.

A defendant must be "in custody" and "interrogated" before the *Miranda* warnings are required to be administered. *Id.* A custodial interrogation occurs when an individual is taken in for questioning initiated by law enforcement after an individual has been taken into custody or "otherwise deprived of his freedom of action in any significant way." *Id.* "A totality of the circumstances test is used to determine whether a reasonable person would have believed he or she was free to leave." *Id.* at 628-29. Under the totality of the circumstances, factors include:

> "(1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that he was not under arrest and was free to leave; (4) whether the individuals were moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the defendant of documents she needed to continue on her way; and (7) whether the officer's tone of voice was such that their requests would likely be obeyed."

*Id.* at 629. The fact that law enforcement administered *Miranda* warnings to a defendant does not serve to establish that a defendant is in custody. *Sprosty v. Buchler*, 79 F.3d 635, 642 (7th Cir.

1996) (noting that the fact that police administered *Miranda* warnings upon their arrival "certainly does not establish that [a defendant] was in their custody").

A defendant is not in custody when a reasonable person would believe they were free to leave under the same circumstances. *Id.* at 628. In *Barker*, the defendant agreed to meet with an agent to discuss an investigation of a weapons purchase at the Bureau of Alcohol, Tobacco, and Firearms (ATF) office. *Id.* at 626-27. Barker was escorted to a conference room where he sat at the end of the table near a closed, but unlocked door. *Id.* at 627. Two agents interrogated the defendant, the defendant was not physically restrained and was advised that he was not under arrest, did not need to answer any of their questions, and was free to leave at any time. *Id.* The defendant was never informed of his right to an attorney. *Id.* Because the agents believed the defendant was lying, the agents told the defendant that they had a videotape of him the crime, even though there was not videotape of the defendant committing the crime. *Id.* One agent stated in the presence of the defendant that it "would be a shame for his sister to testify against him with his mother watching." *Id.* The defendant then made incriminating statements to the agents. *Id.*

The *Barker* court held that, under the totality of the circumstances, the defendant was not denied his Fifth Amendment right against self-incrimination because he was not in custody when the defendant was interrogated. *Id.* at 628. The court reasoned that the defendant voluntarily went to the ATF office, the agents informed him that he was not under arrest, the defendant consented to speak, he was not deprived any of his freedoms, and there was not a "threatening presence" by the officers. *Id.* at 629. Thus, although the defendant was a suspect, the *Miranda* warnings were not required in the *Barker* case. *Id.*

Here, Thomas was not in custody when he was questioned by Kowalski and Kastner. The *Miranda* warnings were not required to be administered because Thomas was not in custody. Under the totality of the circumstances, Thomas was not deprived of his "freedom of action in any significant way" and a reasonable person would believe they were free to leave. Specifically, while in the office, Thomas was seated closest to the closed—but unlocked—door. Thomas was neither searched nor restrained before entering the Community Corrections office nor at any time while being questioned.

Moreover, Kowalski and Kastner informed Thomas that he was not under arrest twice before the interview started. Furthermore, Kastner offered to call Thomas's parents in order for Thomas to receive advice. Additionally, Kowalski stated to Thomas, "If you were to leave…" implying that Thomas was, in fact, free to leave.

While the agents questioned Thomas in a small office room, there was neither a threatening presence by the two agents, nor any display of physical weapons or physical force. In fact, the agents were in normal clothing, allowed Thomas to sit closest to the doors, and permitted him to use the restroom. After returning from the restroom, the office door remained open. While the agents were armed, neither displayed their weapons nor threatened to use the weapons. *United States v. Patterson*, 826 F.3d 450, 457 (7th Cir. 2016) (stating that the fact that the agents being armed does not weigh in favor of custody).

Furthermore, the agent's tone of voice was not such that their "requests would likely be obeyed." Kastner and Kowalski both used normal tones of voice. There were no promises made, threats asserted, or coercive tactics used by the agents. Additionally, Thomas was arrested prior to this case and out on probation; thus, Thomas has had previous encounters with law enforcement. While he was hesitant to talk at first, Thomas eventually consented to speak with

the officers. Finally, Thomas engaged with the agents throughout the whole interview and even stated, "I want to be able to tell everything that I know," "I want to help," and that he had "no objection to talking." Thomas knew that he was not under arrest and free to leave during the interview; thus, under the totality of the circumstances, Thomas was not in custody.

Defendant's Motion to Suppress states that Thomas's statements seeking an attorney can be compared to statements made in *United States v. Hunter*, *United States v. Wysinger*, and *United States v. Lee*. *United States v. Hunter*, 708 F.3d 938 (7th Cir. 2013); *United States v. Wysinger*, 683 F.3d 784 (7th Cir. 2012); *United States v. Lee*, 413 F.3d 622 (7th Cir. 2005). However, this argument is unpersuasive because the defendants in those cases were in custody, whereas in this case, Thomas was not in custody. For example, the defendant in Hunter was shot three times by police officers, where he fell to the ground and was then handcuffed. *Hunter*, 708 F.2d at 939. While at the hospital an officer gave the defendant his *Miranda* warnings and told him he was being charged with a felon in possession of a firearm. *See id*. at 940. Next, in *Wysinger*, the defendant was brought into an interrogation room, told he was under arrest, then was read his *Miranda* warnings. *Wysinger*, 683 F.3d at 789. Finally, in *Lee*, police officers executed a search warrant when they saw the defendant and demanded that he get on the floor, then read him his *Miranda* warnings before questioning him. *Lee*, 413 F.3d at 623-24. Thus, the cases cited in Defendant's motion are inapplicable because Thomas was not in custody.

**2. Even if this Court finds that Thomas was in custody, Thomas did not explicitly invoke his *Miranda* right to counsel.**

Invoking the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. U.S.*, 512 U.S. 452, 459 (1994). In order to invoke the right to counsel, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in

the circumstances would understand the statement to be a request for an attorney." *Id.* If a suspect makes reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* The right to counsel is not invoked if a suspect asks for anyone except an attorney. *See Fare v. Michael C.*, 442 U.S. 707, 727-28 (1979) (holding that a juvenile did not invoke his right to counsel when he asked for his probation officer to be present).

Defendant's Motion states that the agents should have ceased the questioning when Thomas said he needed to "get some advice." However, Defendant's argument is unpersuasive because a reasonable officer could not understand that Thomas might be invoking his right to counsel because Thomas further stated that he needed to "get advice from somebody. You know, my parents, something." Thomas did not assert that he wanted an attorney; rather he asserted that he wanted advice from his parents, which would not constitute invoking his *Miranda* right.

Additionally, Defendant's Motion claims that Thomas made "numerous statements seeking counsel." However, in light of the circumstances, a reasonable police officer could not have understood that Thomas might be invoking his right to counsel. Specifically, Thomas stated, "I'd really, really like to be able to, you know, just get some counsel before we go for any kinda investigation…" However, soon after, Thomas stated that he "could really use like a counselor, or therapist or something to just guide me." Thus, Thomas stating he wanted "some counsel" is ambiguous where reasonable law enforcement would think that Thomas was asking for a counselor or therapist.

Furthermore, Thomas stated that the investigation "sounds to be a lot more serious than whatever else I could possibly think. And so I. . . really. . . need legal representation." While this

could imply that he asserted his *Miranda* rights, under the totality of the circumstances a reasonable law enforcement officer could perceive that this statement was equivocal. Specifically, Thomas stated that based on advice he received in the past, he thought he needed legal representation. However, a reasonable officer could find his statement to mean that the advice he received previously was to get legal representation. Furthermore, Thomas engaged and continued to engage in conversation with the agents, reinitiating and answering their questions. Finally, Thomas also signed a search form consenting the agents to search his computer and phone while being interviewed. Thomas did not explicitly say that he wanted an attorney to represent him. Thus, he did not invoke his right to counsel.

### 3. Even if this Court finds that Thomas was in custody, Thomas waived his right to counsel.

Defendants may waive their *Miranda* rights only if the waiver is "made voluntarily, knowingly, and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Determining whether a waiver meets this standard requires a two-step inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id*. When reviewing the totality of the circumstances, courts consider "the defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental conditions of the defendant, the attitude of the law enforcement officials, and whether law enforcement officers used coercive techniques, either psychological or physical."

could imply that he asserted his *Miranda* rights, under the totality of the circumstances a reasonable law enforcement officer could perceive that this statement was equivocal. Specifically, Thomas stated that based on advice he received in the past, he thought he needed legal representation. However, a reasonable officer could find his statement to mean that the advice he received previously was to get legal representation. Furthermore, Thomas engaged and continued to engage in conversation with the agents, reinitiating and answering their questions. Finally, Thomas also signed a search form consenting the agents to search his computer and phone while being interviewed. Thomas did not explicitly say that he wanted an attorney to represent him. Thus, he did not invoke his right to counsel.

### 3. Even if this Court finds that Thomas was in custody, Thomas waived his right to counsel.

Defendants may waive their *Miranda* rights only if the waiver is "made voluntarily, knowingly, and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Determining whether a waiver meets this standard requires a two-step inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id*. When reviewing the totality of the circumstances, courts consider "the defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental conditions of the defendant, the attitude of the law enforcement officials, and whether law enforcement officers used coercive techniques, either psychological or physical."

Here, it is clear that Thomas voluntarily, knowingly, and intelligently waived his *Miranda* rights. First, agents Kowalski and Kastner read Thomas his *Miranda* warnings, in which Thomas explicitly stated that he understood his rights. Next, there is no evidence that anyone conducting the interview threatened him, made the length of the interview overwhelming long, or used coercive techniques. Finally, Thomas had previous encounters with law enforcement and even stated that he has been read his *Miranda* warnings before and that he understood its implications. Thus, Thomas voluntarily, knowingly, and intelligently waived his *Miranda* rights.

## III. CONCLUSION

The Defendant's Motion to Suppress should be denied. Thomas was not in custody when he was interviewed, and even if this Court finds that he was in custody, Thomas did not explicitly and unambiguously invoke his *Miranda* right to counsel and his statements were made voluntarily, knowingly, and intelligently.

Dated at Milwaukee, Wisconsin, this 7th day of April, 2023.

Respectfully submitted,

GREGORY J. HAANSTAD
United States Attorney

By: */s/ Megan J. Paulson*
MEGAN J. PAULSON
Assistant United States Attorney
Attorneys for Plaintiff
Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, WI 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738