UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff,*

    *vs.*    Case No. 23-cr-10-SCD

JOSEPH THOMAS,

    *Defendant.*

## REPLY IN SUPPORT OF MOTION TO SUPPRESS STATEMENT

When federal agents asked Joseph Thomas' P.O. to summon him to the office for questioning, Thomas had no idea what he was coming in for. He wasn't scheduled to meet with his P.O. for another week. Nonetheless, as required by the conditions of his supervision, he showed up. Once there, he was immediately taken to another room and seated with two federal agents who'd already done an investigation, secured a warrant and searched his home. Thomas was in that room with the two agents for nearly three hours, much of which was spent resisting their persistent efforts to get him to confess, while explaining on several occasions that he wanted "counsel" and needed "legal representation." When the interrogation ended, Thomas left in handcuffs and has been in custody ever since. During the three hours he was seated with agents, Thomas made various statements that he has moved to suppress for *Miranda* violations. ECF no. 13.

Seeking to escape *Miranda's* requirements, the government makes three primary arguments in response: 1) Thomas wasn't "in custody" when his P.O. ordered him to

*Federal Defender Services*
*of Wisconsin, Inc.*

report to the office, so *Miranda* protections don't apply; 2) Thomas never outright asked for a lawyer, so the agents' continued pressure was not improper; and 3) Thomas waived his rights by continuing to speak. Each of these arguments must be rejected.

**I.    Thomas was in custody because no reasonable person would have felt free to terminate the interrogation and leave**

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *United States v. James*, 113 F.3d 721, 726 (7th Cir. 1997), quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994). Thus, "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). "Two discrete inquiries are essential: (1) the circumstances surrounding the interrogation, and (2) given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave." *Yarborough v. Alvarado*, 541 U.S. 652, 653 (2004). The Seventh Circuit has adopted an "objective test that asks how a reasonable person in the suspect's position would have understood the situation." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012).

"A totality of the circumstances test is utilized to determine whether a reasonable person would have believed he was free to leave." *United States v. Riakos-Barker*, 467 F.3d 625, 628 (7th Cir. 2006) (quoting *United States v. Lennick*, 917 F.2d 974, 979 (7th Cir. 1990)). The factors include:

2

*Federal Defender Services of Wisconsin, Inc.*

> Whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individuals were moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; whether the officers deprived the defendant of documents she needed to continue on her way; and whether the officers' tone of voice was such that their requests would likely be obeyed.

*United States v. Thompson*, 496 F.3d 807, 810-11 (7th Cir. 2007).

Other significant factors are the duration of the questioning, statements made by officers during the interrogation, the presence or absence of physical restraints during the questioning, and whether the interviewee was released at the end of questioning. *See United States v. Borostowski*, 775 F.3d 851, 859-60 (7th Cir. 2014). Courts have also considered the size of the room or space used for interrogation. *United States v. Slaight*, 620 F.3d 816, 819 (7th Cir. 2010). "In determining whether a reasonable person in the suspect's shoes would have felt free to leave, we consider 'all of the circumstances surrounding the interrogation.'" *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016) (quoting *Howes v. Fields*, 565 U.S. 499 (2012)).

Numerous factors here lead to the conclusion that Thomas was indeed "in custody."

### a. Thomas' supervising agent ordered him to appear, which supports a finding of custody

First and foremost, Thomas' appearance was compulsory. There was nothing voluntary about this encounter. He was ordered by his state supervision agent to report to the office. This wasn't a regularly scheduled visit, rather it was out of the blue and totally unexpected by Thomas. He complied under threat of revocation. Moreover, Thomas wasn't told the reason he had to report and certainly wasn't expecting to be confronted by two FBI agents when he arrived. So not only was his presence involuntary at the outset, his subjection to the two federal agents was secured through subterfuge. Thus, the fact that Thomas was not there "of his own accord" weighs toward a "finding of custodial interrogation." *Ambrose*, 668 F.3d at 956.

The facts here are strikingly similar to those in *United States v. Barnes*, where the court found that the defendant was in custody when he reported to his parole agent as directed and was promptly confronted by two FBI agents there to question him. 713 F.3d 1200, 1203 (9th Cir. 2013). Thomas, like Barnes, "did not appear voluntarily but rather was told to appear for a meeting with his parole officer under threat of revocation of parole." *Id*. at 1204. Likewise, this was not Thomas' regularly scheduled meeting with his agent, rather it was unplanned and unexpected.

Similarly, in *United States v. Streitz*, the defendant did not appear voluntarily, but was instead "requested" by his agent to appear for a meeting; "a request Streitz was not

4

*Federal Defender Services*
*of Wisconsin, Inc.*

Case 2:23-cr-00010-JPS   Filed 04/20/23   Page 4 of 16   Document 19

free to ignore." *United States v. Streitz*, No. CR 17-19-BLG-SPW, 2017 WL 2633489, at *3 (D. Mont. June 16, 2017). Thomas, like Streitz, was required to report as directed as a condition of supervision, and therefore could not simply ignore such a request. Consequently, "[t]his factor weighs strongly in favor of finding custody." *Id*. at *3. And there's more.

### b. *The location and circumstances of the interview weigh toward custody*

The physical circumstances of the interrogation further support a reasonable belief that Thomas was not free to leave. He was summoned to the community corrections office, a hostile environment for a supervisee, as opposed to his home or a public location. He was not questioned in his agent's office where they might typically meet. He was instead escorted to a small separate room, outnumbered by two trained federal law enforcement agents, with the door closed behind him. This is neither comfortable nor familiar territory for Thomas. He's instead on law enforcement's "home turf" where interviews are more likely to be "police-dominated." *United States v. Ollie*, 442 F.3d 1135, 1139 (8th Cir. 2006). And Thomas communicated that he felt that way:

> THOMAS: Because, I mean, you got, I mean, look at that, it's a two-to-one situation. You know, you got actual FBI agents, you just got me, some schmuck.

Ex. A at 15:33 – 15:40

…

> THOMAS: I, uh, I don't--I--I, you--you guys kind of had a, you know, at an advantage here and...I mean, team size, a homefield advantage, you know, being in this office. And I'm really feeling, you know, kinda—
>
> KOWALSKI: What's the password, Joe?

Recorded interview at 1:09:29 – 1:10:01.

Thomas was expressing exactly what the circumstances communicated to him: he was in a hostile environment, compelled to engage in an adversarial encounter with highly trained and specialized agents, outnumbered and at a disadvantage—the very reasons why he sought the assistance of counsel. Just as the Seventh Circuit in *Slaight* cited as "key facts" the "protracted questioning" in the "claustrophobic setting" of the "Lilliputian interview room," so too here the physical circumstances and location of the questioning support a finding of custody. 620 F.3d at 822.

### c. *The duration of the interrogation supports a finding of custody*

The duration of the interview also supports a finding of custody. Thomas was in the small, closed-door room with the agents for three hours. That's a long time. Questioning that is "prolonged and accusatory" supports a finding of custody. *See Slaight*, 620 F.3d at 819-20.

### d. *Not "under arrest" does not mean free to leave*

Throughout its brief, the government stresses that the agents told Thomas he wasn't under arrest, but that does not mean that he was free to leave. Neither the agents

6

*Federal Defender Services of Wisconsin, Inc.*

nor his probation officer was going to just let Thomas get up and walk away. They already had all the evidence they needed. By telling him he wasn't under arrest the agents were just trying to get him to talk. If he incriminated himself their case would be stronger.

Telling a suspect he is not "under arrest" is an age-old tactic police use to elicit confessions without triggering *Miranda* protections, and this is precisely the tactic criticized by Judge Posner in *Slaight*: "Police sometimes are restive under the restraints imposed by the [*Miranda*] rule and seek to circumvent it by avoiding the appearance of custody," 620 F.3d. at 817. The government likewise asks this Court to entertain that same ruse: since the agents *told* Thomas he wasn't "under arrest," *Miranda* protections do not apply. ECF no 16 at 8-11.

But telling a suspect he is not "under arrest" does not answer the question of whether that person is "in custody" for *Miranda* purposes. Moreover, Courts have found custody even where law enforcement informs a suspect that he is not under arrest.

*See, e.g.*, *United States v. Newton*, 369 F.3d 659, 677 (2d Cir. 2004); *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir.1993). The question is not whether the suspect is formally or officially "under arrest," rather it's whether a reasonable person would have felt free to leave under the circumstances. Here, despite the agents' assurance that Thomas wasn't under arrest, there was no reason to believe he could get up and walk away.

7

*Federal Defender Services*
*of Wisconsin, Inc.*

e. *Thomas was never told that he was free to leave.*

Even if he wasn't under arrest, the agents never told Thomas he was free to leave, which further supports a finding of custody. In its response, the government misquotes the agents when it argues that they suggested Thomas could leave: "Because if you leave here, the story is whatever we find." ECF no. 16 at 5. First, telling Thomas that if he "leaves" without speaking to law enforcement doesn't imply an option to leave freely, as opposed to leaving in custody. But even more problematically, that is not what the agents said. They instead say "because if *we* leave here, the story is whatever we find." Ex. A at 49:47–49:50 (emphasis added). So at no time did the agents suggest Thomas could leave, rather at most that *they* could leave (presumably without him, because Thomas would be on a P.O. hold).

Consider, for example, that at one point Thomas doubts he'll be able to make it to his doctor's appointment later that day, and the agents conspicuously choose not to dispel him of that doubt:

> THOMAS: Well, I got back problems, I got a doctor's appointment coming up, I...I got back problems, kidney problems, you know, I'm just…
>
> KASTNER: That stuff you being treated for?
>
> THOMAS: Yeah, like I said, I've got a doctor's appointment coming up, I...hope I can make that. I don't know what's going on here—
> KOWALSKI: What time is that?
>
> THOMAS: Uh, two.

8

*Federal Defender Services of Wisconsin, Inc.*

> *PAUSE*
>
> KASTNER: All right. And I know you said you were diagnosed with Asperger's ["Mhm."] back in '03...

Ex. A at 7:40 – 8:00. That silence speaks volumes. Thomas wasn't making that doctor's appointment.

Nor does the fact that agents allowed Thomas to use the restroom mean he was free to leave, as the government implies. ECF no. 16 at 10. Even prisoners are allowed to use the restroom; that doesn't mean they can walk out the door. Here too, Thomas' ability to use a toilet does not translate into an ability to end questioning and leave the building. And when he went to use the bathroom he was chaperoned him the entire time, followed closely by his FBI escort, further communicating that he was not free to simply leave.

In any event, Courts have found custody even where law enforcement tells a suspect that he is free to leave. *United States v. Giddins*, 858 F.3d 870, 880 (4th Cir. 2017) ("such a statement 'is not talismanic or sufficient in and of itself to show a lack of custody'"), *accord United States v. Hashime*, 734 F.3d 278, 284 (4th Cir. 2013); *see also Slaight*, 620 F.3d at 821 (defendant in custody even though "the officers were polite and repeatedly told Slaight that he was free to terminate the interrogation and leave"). *A priori* then, the absence of any such indication here weighs heavily toward a finding of custody.

9

*Federal Defender Services
of Wisconsin, Inc.*

### *f. The nature of the questioning suggested Thomas was not free to leave*

Another significant factor demonstrating custody is that the agents confronted Thomas with allegations that would have caused the average person to conclude arrest was a foregone conclusion. He was told there was a warrant executed at his home (probable cause), he was the suspect, they were there "because someone did bad things on your internet connection," (Ex. A. at 16:30) and the agents used Thomas' supervision agent to secure his appearance, indicating a hold would be placed on him regardless. This was precisely the sort of "accusatory" questioning that weighed toward a finding of custody in *Slaight*. 620 F.3d at 819-20.

*Slaight* also involved child pornography charges and the court emphasized that because "*Slaight* knew the police had him nailed so far as illegal possession of computer images was concerned, and he couldn't have believed they would actually let him go." *Id.* at 819. The same is true here: since Thomas knew he stood accused of violating federal law and his supervision conditions, he couldn't have believed he was free to get up and walk away. The "more than likelihood that he would be formally placed under arrest if he tried to leave because the government already had so much evidence against him" is another "key fact" showing "that the average person in Slaight's position would have thought himself in custody." *Id.* at 822. The same is true here.

10

*Federal Defender Services*
*of Wisconsin, Inc.*

Indeed, it was even more reasonable for Thomas to believe he wasn't free to leave because he was under state supervision. In Wisconsin, probation agents routinely place holds for even the slightest of suspected infractions. And Thomas was not summoned for a mere missed appointment or failed drug screen, rather these were federal agents who'd already secured a warrant and searched his home for suspected child pornography. Against this backdrop, it would have been entirely *un*reasonable for Thomas to believe he was free to walk away from that interrogation and go back home.

### g. *Thomas was immediately arrested at the conclusion of the interview*

Finally, Thomas' arrest immediately after the interview further proves that he was at not at any time free to walk away. The agents had obviously informed his P.O. of their investigation, who promptly placed a hold on Thomas. He never made it to his doctor's appointment and has been in custody since that day. This fact weighs heavily toward custody.

### h. **Barker** *does not preclude a finding of custody here*

This case is easily distinguishable from *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006), which the government heavily relies upon. There, the agent and defendant mutually arranged to meet at a predetermined time at the field office. *Id*. at 627-28. That was not the case here. Thomas' appearance was compulsory, under threat of revocation if he did not show up. Nor did he show up expecting an interrogation by two federal

11

*Federal Defender Services*
*of Wisconsin, Inc.*

agents. There too, the defendant was told that he was free to leave (*id*. at 628), a fact absent from this case. Thomas was never told he was free to leave. Additionally, Barker was ultimately allowed to leave after the interview (*id*.), whereas Thomas left in handcuffs—another importantly distinguishing factor. Accordingly, *Barker* does not foreclose a finding of custody here because the facts are substantially distinguishable.

At the end of the day, the government cannot simply dismiss *Miranda*'s requirements by refuting the custodial nature of the interrogation. No reasonable person would have understood that he was free to terminate questioning and walk away under these circumstances, so *Miranda*'s safeguards apply.

## II.  Thomas repeatedly and unambiguously invoked his right to counsel

The undersigned identifies at least nine separate occasions where Thomas indicates his desire for counsel during the interrogation:

- "So I'm, you--you I understand, I'm kind of hesitant without any counsel or anything, and um...I just--I'm trying to find out what the world is going on here?" Ex. A at 9:45 – 10:00.
- "I really need to get some advice..." *Id*. at 11:50 – 12:12.
- "before I can really go forward, I gotta get some advice from somebody." *Id*. at 13:00 – 13:10.
- "you know, this kind of thing, I mean, the FBI coming and everything...this feels a lot more serious than just, uh, you know, something that I feel comfortable navigating by myself." *Id*. at 15:11 – 15:25.
- "I mean, I...yeah, uh...I--I--I'd really, really like to be able to, you know, just get some counsel before we go for any kinda investigation, interrogation, whatever." *Id*. at 15:40 – 15:51.

12

*Federal Defender Services
of Wisconsin, Inc.*

Case 2:23-cr-00010-JPS   Filed 04/20/23   Page 12 of 16   Document 19

- "I would really, really like to be able to get somebody to help me out, on my side, just so we can, you know, cross the T's and dot the I's and go through the proper things, and...I don't know how to navigate this stuff and I don't wanna get myself tangled up in anything—. *Id*. at 21:30 – 21:50.
- "And so I...really, I--I--I need legal representation." *Id*. at 24:50 – 25:03.
- "talking without any counsel at all is not going to do me any good at all for...[pause] And I've been told it's a very, very, uh, poor choice to speak with investigators without getting any kind of legal counsel." *Id*. at 55:00 – 55:30.
- "...you know, I could really use like a--a--a counselor, or therapist, or something to just guide me, because...uh I--I don't even...[pause]" *Id*. at 56:30 – 57:00.

Each of these statements communicates a desire for counsel and is sufficient to invoke that right. But especially combined, these repeated statements leave absolutely no doubt that Thomas invoked his right to counsel and was declining to speak.

In his motion, Thomas likened his repeated invocations to those the Seventh Circuit has found sufficient. ECF no. 13 at 10, citing *United States v. Hunter*, 708 F.3d 938, 943–44 (7th Cir. 2013); *United States v. Wysinger*, 683 F.3d 784, 795-96 (7th Cir. 2012); *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005). Courts outside of our circuit have likewise found similar statements sufficient. *See, e.g.*, *Wood v. Ercole*, 644 F.3d 83, 90 (2d Cir. 2011) ("I think I should get a lawyer" was an unambiguous invocation); *United States v. Cheely*, 36 F.3d 1439, 1448 (9th Cir. 1994) ("My attorney would not want me to talk with you" was an invocation). The common thread among all these statements, like Thomas' multiple statements, is the unambiguous expression of a desire to obtain or consult with counsel

13

*Federal Defender Services of Wisconsin, Inc.*

Case 2:23-cr-00010-JPS   Filed 04/20/23   Page 13 of 16   Document 19

before making a statement, or put another way, a desire to *not* speak without counsel. Thomas clearly communicated that sentiment, and the questioning should have ceased.

Moreover, any of Thomas' statements made *after* invocation do not invalidate his prior invocation. The Supreme Court has made clear that the government cannot use post request statements to cast retrospective doubt on prior unambiguous invocations of the right to counsel. *See Smith v. Illinois*, 469 U.S. 91, 92 (1984) ("Using an accused's subsequent responses to cast doubt on the adequacy of the initial request" is "intolerable"); *see also Subdiaz-Osorio v. Humphreys*, 947 F.3d 434, 449 (7th Cir. 2020) (J. Hamilton, dissenting) ("The Wisconsin Supreme Court's reliance on *Subdiaz-Osorio's* post-invocation answers to inject ambiguity into his request was as clear a departure from U.S. Supreme Court precedent as we are likely to see."); *see also Jones v. Harrington*, 829 F.3d 1128, 1138 (9th Cir. 2016) ("Allowing the government to use these post-request statements to 'cast retrospective doubt' on prior unambiguous invocations would give officers an incentive to ignore invocations in the hopes that a suspect may be persuaded to talk anyway.").

Ultimately, this is not a close call. Thomas plainly invoked his right to counsel, and the failure to end questioning requires suppression of his statement.

14

*Federal Defender Services*
*of Wisconsin, Inc.*

### III. Thomas did not waive his *Miranda* rights

When Kastner asked Thomas if he was willing to waive his *Miranda* rights (Ex. A at 9:40), he never responds affirmatively. He instead resists, for nearly an hour, continually explaining his reasons for not wanting to talk. To be sure, Thomas is overly polite and wordy in his resistance, as opposed to direct and short. But that should not be held to his detriment particularly given the imbalance in power dynamics. Although Thomas was quite nervously deferential, it was painfully obvious that he didn't want to speak. But the agents, perhaps as they are trained, never relent. Without ever getting an affirmative waiver, they just keep questioning him and Thomas eventually starts answering those questions. But there was simply no waiver to speak of, much less one that was freely, intelligently and *voluntarily* made, without coercion or undue influence. The government therefore cannot meet its burden here.

### Conclusion

For all the foregoing reasons, Thomas moves the Court to suppress his statement and any derivative evidence as fruit of the poisonous tree.

15

*Federal Defender Services*
*of Wisconsin, Inc.*

Dated at Milwaukee, Wisconsin, this 20th day of April, 2023.

                    Respectfully submitted,

                    /s/ *Ronnie V. Murray*
                    Ronnie V. Murray, WI Bar #1089136
                    Federal Defender Services
                      of Wisconsin, Inc.
                    411 E. Wisconsin Avenue, Suite 2310
                    Milwaukee, WI 53202
                    Tel. (414) 221-9900
                    Email: ronnie_murray@fd.org

                    *Counsel for Defendant*, Joseph Thomas